IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 3, 2021

### STATE OF TENNESSEE v. MARTERIUS O'NEAL

**Appeal from the Criminal Court for Shelby County**
**No. 15-04917     Paula Skahan, Judge**

---

### No. W2019-02157-CCA-R3-CD

---

The defendant, Marterius O'Neal, appeals his Shelby County Criminal Court Jury convictions of first degree murder, attempted especially aggravated robbery, and attempted aggravated robbery, arguing that the trial court erred by denying his motion to suppress the pretrial statement he provided to the police, by severing his trial from that of his co-defendant, and by limiting his cross-examination of a State witness. Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Eric Mogy, Memphis, Tennessee, for the appellant, Marterius O'Neal.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Leslie Byrd, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Shelby County Grand Jury charged the defendant and the co-defendant, Antwon Young,[1] with the felony murder of Juan Pedro Garcia in the perpetration of aggravated robbery or attempted aggravated robbery; the felony murder of Alvaro Casillas Becerra in the perpetration of aggravated robbery or attempted aggravated robbery; the attempted second degree murder of Jose Rodriguez; the attempted second degree murder

---

[1] The grand jury also charged Austin Yewell with 22 counts of facilitation of a felony that aligned with the offenses alleged against the defendant and Mr. Young.

of Juan Jesus Garcia Gaitan; employing a firearm during the commission of the dangerous offense of the attempted second degree murder of Jose Rodriguez; employing a firearm during the commission of the dangerous offense of the attempted second degree murder of Juan Jesus Garcia Gaitan; the attempted especially aggravated robbery of Jose Rodriguez; the attempted aggravated robbery of Juan Jesus Garcia Gaitan; the attempted aggravated robbery of Manuel De Jesus Casillas Rodriguez; the attempted aggravated robbery of Javier Nava; the attempted aggravated robbery of Reynaldo Almanza; the attempted aggravated robbery of Leonardo Rodriguez; the attempted aggravated robbery of Martin Almanza; the attempted aggravated robbery of Luis Garcia; the attempted aggravated robbery of Aurelio Rodriguez; and the aggravated assault of Eduardo Soriano Almanza related to a shooting that occurred on October 4, 2014.[2]

At some point prior to the defendant's trial, the trial court severed his case from that of Mr. Young.

At the August 2017 trial, Memphis Police Department ("MPD") Officer Christopher Smith testified that on October 4, 2014, he was working as a uniformed patrol officer on the Tillman Station Delta Shift when he responded to the scene of a shooting at 1419 Gherald Street in Memphis. Describing the scene as "rather chaotic," Officer Smith said that "a group of gentlemen on the kind of front lawn" motioned officers toward the house. One man sat outside the house in a chair to the left of the door "bleeding from his leg." Another injured man was seated just inside the door. A third man was lying on a bed inside the house "motionless," and a fourth was lying "in the floor in the kitchen, again motionless." There were other individuals inside the house, but Officer Smith could not communicate with any of the men because they all spoke Spanish. Three victims were transported to the hospital by ambulance, and one was pronounced dead at the scene.

MPD Officer Philip Perez testified that on October 4, 2014, he was working as a uniformed patrolman assigned to the Tillman Station Delta Shift when he responded to a call of a homicide at 1419 Gherald Street in Memphis. When he arrived, he "observed one individual that was actually sitting on the bottom part of the porch and he was bleeding." Most of the men located at the residence spoke only Spanish, but one man spoke enough English to communicate that the man had been shot by two young, African-American men and that the perpetrators had fled on foot southbound from the residence.

Manuel De Jesus Casillas Rodriguez testified via interpreter that on October 4, 2014, he went to visit some friends on Gherald Street. After he had been "there for a little bit maybe about ten minutes," two black men came "from the direction of

---

[2] The victims' names appear in different configurations and spellings throughout the record. For the sake of clarity only, we will identify them as they appear in the indictment, and we intend no disrespect.

Whitestation" and "shot twice up in the air." Some of the men, most of whom were outside in the yard, ran toward the house while those men who had been inside started to run outside when the shooting started. Mr. Casillas Rodriguez said that both of the perpetrators shot toward the house. "They hit one guy here in the knee, the other one here in the stomach and the other one in his back." He recalled that, "[w]hen they stopped shooting I dropped to the ground and one of them came close and went into my pocket and took my wallet" but "dropped it and he left." He said that Juan Jesus Garcia Gaitan "was shot here in the leg and the knee"; Juan Almanza[3] was shot in the "leg, it went through and came out his other knee"; Juan Pedro Garcia was shot in the belly; and Alvaro Casillas Becerra was shot in the back.

Leonardo Rodriguez testified via interpreter that on October 4, 2014, he got off work at noon and "went to pick up my cousins who were coming from Dallas, Texas." He and his cousins, Alvaro Casillas and Juan Casillas, went to eat and then went to 1419 Gherald Street, where Leonardo Rodriguez lived with "[a]round six or seven people." Later that evening, some of their "old friends" came "[t]o see the people that just arrived from Texas." Four men were inside the house, and eight men were outside drinking and talking when "two black guys passed by and they got there to rob us and take our money." He said that the men appeared to come from the direction of White Station. The two men shot into the air, and he heard one of the men say "that they wanted the wallet." He said that he and some of the other men ran toward the side of the house for protection. Four men were shot during the incident. Alvaro Casillas Becerra was shot in the abdomen and lay unresponsive. Juan Pedro Garcia appeared to have been shot in the back but "was still talking."

Jose Rodriguez testified via interpreter that on October 4, 2014, he lived in the Gherald Street residence. He worked that day, and when he returned home at 4:00 p.m., some friends were at the house to visit. Other friends came over later that evening to visit some friends who had come from Texas. At some point, he went inside to use the telephone to call his wife in Mexico. After speaking to his wife, he went back outside and, shortly thereafter, "the two people came and they want[ed] to rob us." The perpetrators "were yelling to drop to the ground and they wanted our wallets." He was shot as he stood in the front yard. The bullet entered the inside of the left leg, exited, and then entered the right leg, coming to rest behind the right knee. He had surgery to remove the bullet. Juan Jesus Garcia Gaitan was also shot in the leg. Alvaro Casillas Becerra and Juan Pedro Garcia were both shot and killed.

Javier Nava testified without the aid of an interpreter that on October 4, 2014, he went to see a friend but ended up stopping at another location when he saw his other

---

[3]     This appears to be a reference to the man named as Jose Rodriguez in the indictment.

friends at the 1419 Gherald Street residence.  The people at the Gherald Street residence greeted him and handed him a beer.  He said that he opened the beer, but before he could take a drink from it, "[s]ome guys came behind and started shooting."  The perpetrators, whom he described as two black men, shot into the air and told the men in the yard to get down.  Mr. Nava, who spoke English, shouted in Spanish for the other men to get down.  He recalled that Manuel De Jesus Casillas Rodriguez did not go to the ground and that one of the perpetrators "went straight to Manuel and told him 'get down mother-f*****.'"  When the front door of the house opened, the perpetrators "started shooting.  I guess the guy got scared and panicked there.  He started shooting towards the door."  At that point, the other perpetrator "started shooting and everybody just got up and started going everywhere."  At some point, the men "just started running," and Mr. Nava assumed that they had run out of bullets.  Two men had been shot in the leg, "[a]nd at that moment I guess they didn't feel the bullets because they were still walking."  One man had been shot and was lying "on the floor mumbling in panic" while "the other guy was in the kitchen holding his wounds."  The two who had been inside the house died as a result of their injuries.

MPD Crime Scene Investigator Christopher Sanders prepared sketches and diagrams of the Gherald Street residence and photographed each of the items collected into evidence, which items included a number of Federal brand .45 caliber shell casings.

MPD Detective Roy Redding responded to the Regional One Medical Center as part of the investigation and learned that one of the shooting victims was in surgery and that two were "non-critical" with gunshot wounds to the legs.  One of the victims that Detective Redding was able to interview spoke "broken English."  That man said that "there were two male black suspects."  Another officer collected a spent bullet removed from a victim at the medical center.

MPD Sergeant Eric Kelly, who acted as the lead investigator in this case, testified that when he arrived at the Gherald Street residence, "there were four, actual wounded victims" and "a total of nine males that were the victims of an attempted robbery and they had been shot at."  Three of the wounded victims were transported to the Regional One Medical Center, and the body of the fourth victim was transported to the medical examiner's office.  Over the course of his investigation, Sergeant Kelly identified the defendant and the co-defendant, Antwon Young, as suspects in the shooting.  He also learned that a third person, Austin Yewell, may have had some involvement in the crime.

Sergeant Kelly interviewed the defendant with regard to the offenses, and the defendant's statement was read into the record.  In his statement, the defendant said that his older cousin, "Nuke," whose given name was Antwon Young, was responsible for the shooting on Gherald Street.  The defendant said that, during the shooting, he was armed

-4-

with a .45 caliber handgun and that Mr. Young was armed with a .38 caliber revolver that he had gotten from Mr. Yewell. The defendant said that on October 4, 2014, the three men were at the defendant's grandmother's house when Mr. Yewell showed them the guns and said that he had no clip for the .45 caliber handgun. Mr. Young asked Mr. Yewell how much a clip would cost, and Mr. Yewell told Mr. Young that "he would pay for one if he went to get it." Mr. Young directed the defendant to telephone "Guns and Ammo on Summer and ask how much for an extended clip and ammo for it to see how much it cost." The defendant said that after he told Mr. Young and Mr. Yewell what he had learned with regard to the cost of a clip and ammo, Mr. Yewell gave Mr. Young "like ninety, a hundred dollars," but Mr. Young told them that he could not get the clip and ammunition "because he has a felony, so he asked Melvin [Wiggins] to go buy it and I got in the back seat of Melvin's car and rode with him, to play with the baby." The defendant said that after Melvin purchased the items, they returned to the defendant's grandmother's house "and got the stuff out and gave it to Nuke to make sure it fit. Nuke took it and said that it did fit."

The defendant told Sergeant Kelly that, later that same day, the defendant, Mr. Young, and Mr. Yewell went "riding around." The defendant said that they "just rode around and listened to music. We rode around a bend in the road and we passed this group of Mexicans and when we got to the corner Nuke told Austin to turn left and stop at the next corner." "Nuke got out and he had both of the guns and my phone, so I got out and I went to catch up with him. I walked with him and I was listening to my music." The defendant said that, as he and Mr. Young "got closer to the Mexicans he told me to hold the .45 gun. When we got closer he said if they do anything if I shoot you shoot. If you don't we gone [sic] to have a problem." The defendant claimed that Mr. Young "had a reputation for beating people. I watched him beat his baby mamma with a gun in his hands, so I was scared." The defendant told Sergeant Kelly that Mr. Young "shot up in the air and demanded them to get on the ground." The defendant said that those men closest to Mr. Young got to the ground while one of the men ran toward the defendant and then back toward the house. Mr. Young told the defendant to search the men who lay on the ground, and the defendant "put my hand on his back and acted like I was doing it and the guy looked up to me like he was asking me for help." At that point, the front door of the house opened, and Mr. Young "went towards it. He started shooting. He was shooting towards the front door, then he was shooting towards the ones running down the side of the house." Mr. Young "looked back at me and told me to shoot. I held the gun up and closed my eyes and shoot it a couple of times and ran off." The defendant said that Mr. Young followed him, angry that he had not searched the men. Mr. Yewell pulled up, and the defendant and Mr. Young got into Mr. Yewell's van. The defendant told Sergeant Kelly that Mr. Young said that "he shot some of the dudes. He said that the dude that came to the door he shot him in the chest." Mr. Young then directed Mr. Yewell to drive him to Mr. Young's grandmother's house. Mr. Young kept both of the guns. On the following day, Mr. Young

told the defendant that he had seen on the news that the two men he had shot had died. A few days later, Mr. Yewell came and got the .38 caliber handgun from Mr. Young so that he could sell it, but Mr. Young kept the .45 caliber handgun.

Sergeant Kelly testified that the defendant identified a photograph of Mr. Young. On the back of the photograph, the defendant wrote:

This is my cousin, Antwon Young, Nuke. On the day of the shooting I wasn't aware that this was about to happen. We was just driving around, me, Austin and Nuke. Nuke was in the backseat of Austin's grandmother's car, van. We drove past the house and when we got to the corner Nuke told Austin [sic] to the left and he did.

Nuke said stop right [sic] and he got out and had both guns. I just got out because he had my phone. Austin pulled off. I got my phone and was listening to music and we walked. When we got close Nuke said hold this gun, the .45, then he was holding a .38 that Austin let him see.

There were a lot of people out there. Nuke said if they try something and I shoot, you shoot. If you don't we're going to have a problem. I didn't expect this. I didn't know this was going to happen.

Nuke shot in the air and told them to get on the ground. He made the ones in the front do it, the others ran. One came towards me, one came toward the street side where I was when he ran back behind the house. Nuke told me to search them but I didn't. I put my hand [on] one guy's back, he looked at me for help. But the [door]opened -- and Nuke started shooting and yelled at me to shoot.

I held the gun in the air and shot a few times but not at anyone, then I ran. Nuke came after me, he was very upset because I didn't search them. And he got to the next street I seen [sic] Austin in the van. I ran and jumped in the front.

Nuke got in the back. He was just talking about he shot some people, one in the chest. I said you shot someone? Nuke said yes. Nuke said take him to my grandmother's house.

During cross-examination, Sergeant Kelly said that the defendant gave an initial version of events during the interview that Sergeant Kelly classified as "not factual" but that he "ultimately" provided "a somewhat factual statement in regards to" the Gherald Street shooting. Sergeant Kelly reiterated that the defendant's first version of events "wasn't totally consistent" with the known facts and evidence. In the first version, the defendant "admitted to participating but he didn't admit his full participation, and he had extra people that actually weren't there." Sergeant Kelly added, "He told a story which was not completely factual and left hisself [sic] out of doing certain things like pulling a trigger on a double murder."

During redirect examination, Sergeant Kelly testified that the interview room was not set up for video recording interviews but that, once the defendant began to provide "factual information," Sergeant Kelly tried to record the defendant with his cellular telephone to capture "how casual and callous he was explaining" the circumstances of the shooting "because I wasn't going to be able to really articulate it in words." Sergeant Kelly recalled that the defendant "actually got up and drew out on the chalkboard" the location of the victims and the street and "how they walked around and basically stalked the victims and ran up on them and commenced doing what they ended up doing." Sergeant Kelly said that he "couldn't believe how it was unfolding so I decided to record it."

Melvin Wiggins testified that the mother of his children, Shalanda Scott, is the defendant's cousin and Mr. Young's sister. Mr. Wiggins said that he often visited Ms. Scott, Mr. Young, and the defendant, whom he knew as "Nunie," at their grandmother's house on Coleman Street. On October 4, 2014, Mr. Wiggins went to visit Ms. Scott at the Coleman Street residence. Mr. Wiggins testified that when he arrived, the defendant and Mr. Yewell were also there. Mr. Wiggins said that the defendant "asked me can I go get a magazine and bullets so they can go to the bottoms." He recalled that the defendant specifically wanted him to buy a .45 caliber magazine. Mr. Wiggins stated that he, Ms. Scott, the defendant, and Mr. Wiggins' children went in Mr. Wiggins' car to Guns and Ammo to make the purchase. After Mr. Wiggins bought the magazine and ammunition, he gave them to the defendant, and the group returned to the Coleman Street residence, where Mr. Yewell was waiting for the defendant.

Mr. Wiggins testified that the defendant and Mr. Yewell left in a white minivan and returned approximately an hour and a half later. Mr. Yewell, who was still driving the white minivan, dropped the defendant and Mr. Young at the corner near the Coleman Street residence. Mr. Wiggins said that the defendant and Mr. Young were talking about "[g]oing to hit a lick," which meant that they were planning to "go rob someone." He recalled that the men specifically discussed robbing "some Mexicans." At some point, Mr. Yewell returned to the Coleman Street residence, and then Mr. Young and

the defendant left with Mr. Yewell in the white minivan. They returned to the Coleman Street residence after dark. Mr. Yewell left, and the defendant and Mr. Young went into the house. Mr. Wiggins described the defendant and Mr. Young as "[h]yped" and "[k]ind of shook" and recalled that the defendant had a .38 caliber handgun. Neither the defendant nor Mr. Young discussed the shooting with Mr. Wiggins that night.

Mr. Wiggins testified that, a couple of days later, the defendant came to Mr. Wiggins and "told me not to tell nobody that he shot one of them in the shoulder." The defendant told Mr. Wiggins that "four Mexicans" had been shot. Mr. Wiggins said that after he learned from the local news that two of the victims had been killed, he confronted the defendant, and the defendant "said that was us." The defendant said that Mr. Young "shot and hit one in the leg and I hit one of them in the shoulder. We rushed them when they was running back in the house and ran up on them and took their money."

Austin Yewell testified that he had been a friend of the defendant's, who went by "Nunie," for 10 years and that he knew Mr. Young, who went by "Nuke," through the defendant. Mr. Yewell said that he did not know Mr. Wiggins. Mr. Yewell said that he visited the Coleman Street residence of the defendant's grandmother on October 4, 2014, and, while there, heard the defendant "talking to [Mr.] Young about hitting a lick," which meant "[d]oing a robbery." At some point, the defendant asked Mr. Yewell "if I would take him around to go hit a lick," by which the defendant meant drive him around looking for people to rob. Mr. Yewell, who was driving his grandmother's white minivan, agreed to take Mr. Young and the defendant. He recalled that, as they drove, they saw "a house full of drunk people in the yard. It was a house full of Mexicans in the front yard." Mr. Yewell testified that the defendant indicated that "he spot[ted] a lick." Mr. Yewell said that "[t]here was loud music playing and they had a lot of beer cans on the ground." Mr. Yewell drove "around a couple of times," "[a]nd then I pulled over to the street on the other side." Mr. Young and the defendant, who were both armed, "got out and went around." Mr. Yewell said that the defendant carried a .45 caliber "Highpoint" handgun and that Mr. Young carried a .38 caliber handgun that belonged to Mr. Yewell.

Mr. Yewell testified that he heard gun shots a few minutes after the defendant and Mr. Young got out of the van and that, a short time after that, the defendant and Mr. Young came "running around the corner" and got into the van. The defendant "said that they almost got them and Nuke said that he thinks that he hit one of them b****es in the chest." Mr. Young and the defendant told Mr. Yewell that "they did not receive any proceeds" from the attempted robbery. Mr. Yewell said that, at that point, he "told [Mr. Young] it was getting real late that we had to go to the house, it was that I had to go to the house, asked if I could drop them off so I dropped them off on Coleman and I left." During the police investigation of this offense, Mr. Yewell told the police to whom he had sold the gun, and the police went and got it.

Deputy Chief Medical Examiner and Forensic Pathologist Doctor Marco Ross performed the autopsy of Alvaro Casillas Becerra on October 5, 2014. Mr. Casillas Becerra "had a gunshot wound of the chest with an entrance wound on the left upper front of the chest wall" and "a small bruised area on the front of his left shoulder." "The bullet perforated the left sterno clavicular joint, . . . then perforated the left common carotid artery . . . , and then it went through the aorta" before traveling "through the left lung and . . . the costovertebral joint and . . . continued into the back tissues where we recovered the bullet." The cause of death was "a gunshot wound of the chest" and "the manner of death was a homicide."

Doctor Ross also performed the autopsy of Juan Pedro Garcia on October 5, 2014. When Juan Pedro Garcia's body arrived for examination, it bore "multiple artifacts related to the previous medical intervention" he received at the hospital. For this reason, "it was initially difficult to evaluate" the wound that led to his death. "The injuries that he sustained as a result of the gunshot wound was an entrance wound on the front of the abdomen near the mid-line. The bullet had perforated the small intestine." Doctor Ross testified that it "perforated the left common iliac artery [and] the left common iliac vein. Those are the major blood vessels that give blood supply to the left side of the pelvis and to the entire left leg." "[A]fter it had perforated those blood vessels," the bullet "had continued through the left pelvic bone and into the left buttock which is where we recovered the bullet." The cause of death was "a gunshot wound to the abdomen, and the manner of death was certified as a homicide."

Tennessee Bureau of Investigation Special Agent and Forensic Scientist Cervinia Braswell testified that the three .45-caliber shell casings that she examined in this case had all been fired from the same weapon and that the markings on the casings were "consistent with having been fired from a Highpoint .45 auto caliber pistol." Agent Braswell also examined two bullets recovered from the Gherald Street residence, "one that's .45 auto caliber" and one that was a .38-caliber. Agent Braswell said that she could not match bullets or bullet fragments to shell casings because they are "marked by separate parts of the gun." Agent Braswell also examined a .45 auto caliber bullet that was collected from Regional One Medical Center. That bullet, she said, had "the same characteristics as the" .45 auto caliber bullet recovered from the Gherald Street residence. The bullet recovered during the autopsy of Mr. Casillas Becerra was "also a .45 auto caliber bullet that is consistent with the other two .45 auto caliber bullets." The .38 bullet recovered during the autopsy of Juan Pedro Garcia and the .38 bullet fragment recovered from the Gherald Street residence bore "the same class characteristics and some similar individual characteristics to" the revolver that Mr. Yewell identified as having belonged to him and used by Mr. Young during the October 4, 2014 shooting, but Agent Braswell could not "say conclusively" that they had been fired from that gun.

Based upon this evidence, the jury convicted the defendant as charged of the felony murder of Juan Pedro Garcia; the felony murder of Alvaro Casillas Becerra; the attempted aggravated robbery of Juan Jesus Garcia Gaitan; the attempted aggravated robbery of Manuel De Jesus Casillas Rodriguez; the attempted aggravated robbery of Javier Nava; the attempted aggravated robbery of Reynaldo Almanza; the attempted aggravated robbery of Leonardo Rodriguez; the attempted aggravated robbery of Martin Almanza; the attempted aggravated robbery of Luis Garcia; the attempted aggravated robbery of Aurelio Rodriguez; and the aggravated assault of Eduardo Soriano Almanza. The jury acquitted the defendant of the attempted second degree murder of Jose Rodriguez; the attempted second degree murder of Juan Jesus Garcia Gaitan; employing a firearm during the commission of the dangerous offense of the attempted second degree murder of Jose Rodriguez; and employing a firearm during the commission of the dangerous offense of the attempted second degree murder of Juan Jesus Garcia Gaitan. Following a sentencing hearing, the trial court imposed a total effective sentence of life imprisonment.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant asserts that the trial court erred by denying his motion to suppress the statement he gave to Sergeant Kelly, by severing his trial from Mr. Young's, and by limiting his cross-examination of Sergeant Kelly.

*I. Suppression*

The defendant contends that the trial court erred by denying his motion to suppress the statement he gave to Sergeant Kelly. The State asserts that the defendant waived consideration of this issue by failing to provide appropriate references to the record and by failing to provide an adequate record for review.

Prior to trial, the defendant moved to suppress his pretrial statement to police on grounds that Sergeant Kelly unconstitutionally continued to question the 17-year-old defendant outside the presence of his mother and in the absence of counsel even after he specifically and repeatedly asked for the assistance of both. No transcript of the hearing on the defendant's motion appears in the record on appeal. In the written order denying the motion to suppress, the trial court found that officers did not coerce the defendant's statement. The court concluded that the defendant was provided with *Miranda* warnings and that he executed a written waiver of his constitutional rights before giving his statement. The court accredited the testimony that the defendant did not ask to terminate the interview and did not request an attorney at any point. The court found that no evidence supported the defendant's assertion that he provided statements solely because he thought that he would be a witness and would not be charged. Ultimately, the court determined

that the totality of the circumstances established that the defendant's statement was voluntary.

As the State correctly points out, although the defendant makes references to a transcript of the motion hearing, no such transcript appears in the appellate record in this case. Without the transcript, we cannot evaluate the propriety of the trial court's ruling. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which record "shall consist of . . . the original of any exhibits filed in the trial court," Tenn. R. App. P. 24(a). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). In the absence of the transcript of the hearing on the defendant's motion to suppress, we must presume that the trial court correctly denied the motion.

## *II. Severance*

The defendant claims that the trial court erred by severing his case from Mr. Young's. As the State correctly points out, the record contains no information at all regarding the severance of the defendants in this case. No request for severance or order to sever appears in the record. There is no transcript of any proceeding conducted with regard to severance. The defendant makes some blanket allegations that seem to suggest that the defendants were severed based upon delay occasioned by Mr. Young's desire to obtain new counsel, but nothing in the record supports these allegations. Again, the defendant, as the appellant, has failed to sustain his burden of supplying an adequate record for appellate review, and, in consequence, we must presume that the ruling of the trial court was correct.

## *III. Cross-Examination of Sergeant Kelly*

The defendant asserts that the trial court erred by limiting his cross-examination of Sergeant Kelly, arguing that he should have been permitted to question the detective about Sergeant Kelly's disciplinary hearing. The State contends that the trial court did not err.

In reply to a question posed on cross-examination, Sergeant Kelly said that he had "only gone through the required Sergeant training. My interview skills and technique come from years of being on the streets and from what my parents taught me about how to treat people." At that point, the defendant argued that Sergeant Kelly's response had opened the door to his being cross-examined about having "been suspended and even terminated for assaulting and attacking suspects." The State argued that the defendant's statement was "a huge mischaracterization of Officer Kelly's disciplinary

record" and that "almost everything that would come even remotely close to anything of that nature is twenty years old and has nothing to do with doing an interrogation." According to the prosecutor, one incident occurred in January 1998, and another occurred in June 1997. The State argued that the disciplinary records were hearsay and that, if the defendant had wanted to question Sergeant Kelly about any specific instance of conduct that led to his being disciplined, he should have provided sufficient pretrial notice under Tennessee Rule of Evidence 608. The State also argued that the proof of any such acts would have to come firsthand from witnesses and could not come via the disciplinary records. The State noted that, had it been given proper notice, a full hearing could have been had. The State argued that "if this is for impeachment purposes it is past ten years" and asserted that, although the defendant "gave me notice of one event," he only gave me little snippets of facts, not the stuff where I could have the witnesses, so it is not meaningful notice." The State asserted that the age of the acts and their probative value for truthfulness did not satisfy the requirements for admission under Rule 608. The trial court observed that the issue should have been presented "ahead of time so I can consider all of this information, take it under advisement and issue a ruling." The court ruled that Sergeant Kelly's statement "that he learned how to treat people by the way he was raised by his parents" did not open the door to anything because "we don't know how his parents raised him. So I really don't know what that means." The court concluded that it did not open the door to "his credibility for truthfulness" and that "[e]ven if it did under 608 you have to give notice for a specific instance of conduct." The court noted that the State was also entitled to "sufficient advance notice of the intent to use this evidence as provided so that they may contest the use of such evidence" in a hearing. The court found that given the State's strong objection to the evidence, "we'd have to have probably a couple of days hearing on this and we just can't do that right now." The court permitted the defendant to enter the records for identification only as an offer of proof.

Tennessee Rule of Evidence 608 provides, in pertinent part, as follows:

Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-

examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect . . . .

Tenn. R. Evid. 608(b)(1)-(2).

In our view, the trial court did not err by barring cross-examination of Sergeant Kelly with specific instances from his disciplinary record. First, the defendant did not provide the State with sufficient notice of his intent to use the evidence. Second, the defendant, as the proponent of the evidence, should have, but did not, request a hearing to determine the admissibility of the evidence. *See State v. Philpott*, 882 S.W.2d 394, 404 (Tenn. Crim. App. 1994). Third, the procedural default notwithstanding, the instances of conduct themselves do not satisfy the requirements for admission under Rule 608 because they were more than 10 years old and were not probative of Sergeant Kelly's character for truthfulness.

*IV. Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-13-